UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 03-60259-CR-COHN

UNITED STATES OF AMERICA

v.

STEPHEN JOHN JORDI

_____/

## GOVERNMENT'S MOTION FOR UPWARD DEPARTURE

The United States of America, by and through the undersigned Assistant United States Attorneys, files its Motion for Upward Departure, and states the following in support hereof:

1. <u>Background</u>.

Defendant Stephen Jordi pled guilty on February 13, 2003, to one count of attempted arson, in violation of Title 18, United States Code, §844(i). The matter is scheduled for sentencing on Friday, May 14, 2004, at 1:30 p.m. The PSI has been prepared and arrives at a presumptive guideline range of 33-41 months (level 20), but because the offense of conviction carries a five year minimum mandatory sentence, the guideline range is in fact 60 months. For the reasons set forth below, the government respectfully moves for an upward departure because the defendant through his actions sought to intimidate or coerce a civilian population by firebombing abortion clinics.

2. <u>Memorandum of Law</u>.

§3A1.4, application note 4, of the United States Sentencing Guidelines provides as follows:

> Upward Departure Provision. – By the terms of the directive to the Commission in section 730 of the Antiterrorism and Effective Death Penalty Act of 1996, the adjustment provided by this guideline applies only to federal crimes of terrorism. However, there may be cases in which (A) the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct but the offense involved, or was intended to promote, an offense other than the ones specifically enumerated in 18 U.S.C. §2332(g)(5)(B); or (B) the offense involved, or was intended to promote, one of the offenses specifically enumerated in 18 U.S.C. §2332(g)(5)(B), *but the terrorist motive was to intimidate or coerce a civilian population, rather than to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. In such cases an upward departure would be warranted* . . .

USSG §3A1.4, application note 4 (emphasis added).

A "federal crime of terrorism" is subject to punishment under §3A1.4, which imposes severe penalties by setting the offense level at level 32, criminal history category VI. "Federal crime of terrorism" is defined in 18 U.S.C. §2332b(g) as any offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and which offense is also listed in part B of the statute. Part B includes arson and bombing of property used interstate commerce, in violation of 18 U.S.C. §844(i). Attempted arson has been held to be covered by this section as well. See <u>United States v. Graham</u>, 275 F.3d 490, 516 (6th Cir. 2001).

Because defendant Stephen Jordi's attempt to firebomb abortion clinics did not seek to influence or affect the conduct of government, he is not subject to punishment under the guideline level established by §3A1.4. However, the evidence demonstrates that the defendant sought by his

actions to intimidate and coerce a civilian population to ensure that these clinics would be unable to provide clients with abortion services. This is precisely the factual scenario that application note 4 of §3A1.4 is intended to address.

Initially, it should be noted that defendant fully accepted that his actions would constitute acts of terrorism:

> SJ[1]: Well, considering I've ordered over the internet a prolific book known for **terrorists**, you know, ties, and since I've been talking to Paul Hill, a known **terrorist** on death row, uhm . . . I have no doubt that they're after me . . . and I'm not worried about it at all. . .

Tr. Aug. 18, 2003, p. 38 (emphasis added).

> SJ: I already told my wife, if I come home, you're gonna turn me in . . we're gonna spend the afternoon together, and then you're gonna call the cops, you're gonna turn me in, and I'll be gone . . . cause I'm not gonna have my wife getting in trouble. I'm not gonna have her aiding and abetting a worldwide known **terrorist** blowing up faggots and abortion clinics and whatever else, not, including churches. I might go out and blow up a couple ah, apostate churches too.

Tr. Aug. 18, 2003, p. 50 (emphasis added).

> SJ: One of the things cops do when they follow you, at least when they tail you good, they're really intent on it, they'll have six cars after you (UI) . . . back and forth . . . It depends if they're really intense, (UI) . . . more resources, and now they have even more resources. Since this stuff they consider **terrorism**, and the **terrorism** has really been pumped (UI) . . . I don't want to underestimate the (UI).

Tr. Aug. 28, 2003, p.33 (emphasis added). Regardless of how the United States Sentencing Guidelines defines Stephen Jordi's conduct, the evidence indicates that there was little doubt in his

---

[1] References to the speakers in transcript citations will be indicated as "SJ" for defendant Stephen Jordi and "CW" for the cooperating witness/confidential informant.

3

mind that his bombing spree would be regarded as "terrorism."

In tape recorded and videotaped conversations with the CW, defendant Stephen Jordi explained the true motive behind his desire to bomb abortion clinics. Jordi's goal was to make it unsafe and economically unfeasible to operate clinics where abortions are performed, by intimidating clinic owners, clinic employees, and clinic clients. During his initial meeting with the CW, defendant opined that one need not act as Paul Hill did by murdering an abortion doctor, to make a "monetary" impact against abortion clinics:

> SJ: When you take one entity out, and like I said, I won't be killing abortion doctors, cause I don't have the means. I don't have the means to hunt them down, to do surveillance, and shoot them down and (UI). But I do have the means to take out abortion clinics. Which is more monetary, and still very frightening. Maybe I'll (UI) . . . to do this, not to become an abortion doctor. I'm still gonna raise the insurance prices, right now Planned Parenthood has been bombed so much that they cannot have insurance on an outside facility, they have to provide their own insurance.
>
> CW: So they –
>
> SJ: . . . can you imagine the overhead that generates? Every instrument in their shop has to be one hundred per cent insured, plus every individual.
>
> CW: So that's why you're leaning towards bombing instead of . . . I understand what you're saying, that does make sense.

Tr. Aug. 17, 2003, p. 22. Defendant also suggested that for every day of "down time," every day that a clinic was out of operation, lives would be saved.

> SJ: Lots of different ways to get it accomplished, I'm looking for the most reasonable and most efficient and the most safe. Because if I get caught after two or three bombings, (UI) . . . I plan on doing this for the next 30-40 years, or at least until I get caught.

    CW:    Well, buddy, if all we can do is two or three . . .

    SJ:    That would be something.

    CW:    It would be something, but it wouldn't be . . .

    SJ:    It would be something . . . if you can save a couple lives, and make an issue.

    CW:    Yeah, yeah make an issue, but, think about how in the next two years how many children will (UI).

    SJ:    Yep, there's a war. (UI) war going on, with casualties.

Tr. Aug. 17, 2003, p. 56.

On August 25, 2003, while surveilling a number of Broward County abortion clinics[2] to determine entry points for explosives and evaluate security features of the buildings, defendant again noted that attacking a clinic could make it uninsurable.

    SJ:    There's something I need to think about is ah, checking out some of my Fort Lauderdale locations . . .but I have, and Planned Parenthood is a good place to. Cause we met, we've already made such a good dent with them that there's, they can't even get insurance on the outside. They have to pay for their own insurance.

    CW:    Really?

    SJ:    It's great. (laughs) Yeah.

Tr. Aug. 25, 2003, pp. 67-68. During the same conversation, defendant discussed the possibility of using a bluff or decoy to disrupt business at abortion clinics by parking a car in front of them with a note or marking on it suggesting a bomb. In doing so, he again provided insight into his motive:

    SJ:    Who said we have to hit an abortion clinic all the time?

---

[2] Defendant made clear later in the investigation that he would strike abortion clinics north of Broward County, and had no intention of attacking those clinics that he had surveilled.

        There's plenty of (UI) around.

        * * *

SJ: Doesn't have to be a bomb either. Like I said (UI). Ah, park your car in front of it. And ah, you know.

CW: (UI).

SJ: (UI) your car with an explosive.

CW: No you still got.

SJ: Well, well you know, they think (UI) explosive. Just (UI) parking lot (UI) put down, you know. "Bombs for babies" on the outside of the car and they're gonna come in there with a magnifying glass and under every corner of that car, you know (laughs).

CW: Yeah, (laughs) yeah, yeah.

SJ: (UI) don't know if it's under the seat, under the hood (UI) . . . the gas tank. And that, that place can be closed for a whole day just to (UI).

CW: And that (UI). (UI) then that'll stop it going (UI) other clinics too. People will be scared to go.

SJ: (UI) advertisement too. "Bombs for babies please contact" (UI).

Tr. Aug. 25, 2003, p. 75-76.

      Defendant plainly sought by his actions to intimidate the public and abortion clinic owners and employees by making sure that "people will be scared to go." He also sought to do economic damage to abortion clinics by shutting them down through firebombing, and by causing their insurance rates to rise or force them to bear the cost of self-insurance. These motives in conjunction with defendant's actions are precisely the conduct that application note 4 of §3A1.4 is intended to

address, and the government respectfully urges the sentencing court to depart under this provision.

Should the sentencing court agree that an upward departure is warranted, the government respectfully submits that the appropriate starting point for a departure where a minimum mandatory sentence differs from the guideline sentence is the minimum mandatory sentence, rather than the actual guideline range as determined by the PSI. United States v. Head, 178 F.3d 1205 (11th Cir. 1999). Thus, should the court decide to depart upward, the degree of departure must be determined from the 60 month level, rather than the actual guideline level as calculated by the PSI, which in this instance is presumptively a level 20, or 33-41 months. The government respectfully submits that a higher sentencing range would more appropriately address the seriousness of defendant's conduct in planning and attempting to firebomb abortion clinics and thereby intimidating and coercing a civilian population. Unless otherwise ordered by the court, the United States will articulate its specific sentencing recommendation at the sentencing hearing.

**WHEREFORE**, for the reasons set forth above, the United States respectfully prays the court to grant it's Motion for Upward Departure.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

By: _____
JOHN C. SCHLESINGER
ASSISTANT U.S. ATTORNEY
FL BAR #788716
99 N.E. 4th Street
Miami, FL 33132
(305) 536-5791
(305) 530-7976 FAX

By: _____
GERALD GREENBERG
ASSISTANT U.S. ATTORNEY
FL BAR #0440094
99 N.E. 4th Street
Miami, FL 33132
(305) 961-9169
(305) 530-7976 FAX

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was mailed and faxed this _____ day of May, 2004 to Ann Lyons and Michael Spivak, Office of the Federal Public Defender, 150 W. Flagler Street, Miami, FL 33131; Sara Garcia, U.S. Probation Officer, 300 NE 1st Avenue, Miami, FL 33132.

_____
JOHN C. SCHLESINGER